The next case on the calendar is United States v. Aytes. Mr. McDonald. May it please the court, James McDonald on behalf of the appellant, United States. The district court's decision to overturn the jury's verdict, which depended on its re-weighing of trial evidence and its reliance on unsupported defense legal theories and arguments that are wholly inconsistent with this court's case law, should be reversed. First, on the issue of whether the documents that Allison Aytes stole had a value of at least $1,000, the district court's decision directly contradicted this court's holding in Robey. The reasons given by the district court do not stand up to a full review of the trial record. First, when the district court cited that none of the government witnesses could ascribe a value to living wills when asked, that's incorrect. Not only did the director of the Office of Complex Financial Institutions, the body within the FDIC that is responsible for overseeing and using these living wills, describe that these documents had value, he described that value as enormously valuable to the FDIC in carrying out a critical mission of the FDIC, which is to prevent another Lehman-style financial crisis through the planning of a resolution for the largest financial institution. May I ask you, though, Section 641 has a specific set of definitions of value, face, par, market value, or cost price, and you can choose whichever of them and you get the higher of them. Where in that structure does value to the FDIC fit in? I would have thought your best argument was cost price to the creator. That's right, and what the government argued first was cost price. We put forward four witnesses who testified that each of the documents stolen cost more than a million dollars, and collectively the documents cost $27 million or more, the cost of them to produce and provide to the FDIC. Additionally, we argued a number of factors that the jury could reasonably have considered as market value, and that's really what I'm addressing with respect to what their use and the value of their use would have been. When Director Delfin testified, he explained that if living wills were not available to the FDIC or they did not contain the information or there was a leak of the information, they were publicized. The risk was that if a financial crisis came, the FDIC would need to create the information, would need to go out, collect this information, and create its own method and model for resolving failing financial institutions, and there would be enormous cost in doing that. You can think of a number of situations where what someone actually pays for something may not reflect the actual value. You may get a gift. Are these living wills the type of thing that anybody would want to buy? When you refer to market value, is there a market for these things? Well, there's certainly a market within the financial institutions that are regulated by the FDIC, the types of jobs that Ms. H was applying for. There's certainly a market there. Do people buy and sell these things? They're certainly not bought and sold at Walmart, Your Honor. They're thousands of pages, and they are for a very specific use by financial institutions and the regulators at the FDIC and the Federal Reserve. So there's not an open market on which they're traded. Is the theory that these things were of value to her because she was going to use them in her new job? Should she get a job with one of these other banks? Was that what was argued at trial? It was, Your Honor, that Ms. H, and this was most directly seen with the count one charge, which was the theft of the Deutsche Bank living will, that she was taking the versions of the living wills to assist her in getting a job. And we put forward trial evidence of this that would pay anywhere from $100,000 to $200,000. And specifically, we had a Deutsche Bank recruiter come in and testify about a conversation she had with Allison Ates the day prior to Ms. H, for the first time ever, accessing a Deutsche Bank living will. And by chance, or as we argued, not by chance, the job she was applying for at Deutsche Bank was in resolution planning and in preparation of living wills. And so she went right to the source of what anyone would presume you would have been asked about in a job interview for Deutsche Bank. She could have accessed these within the workplace and not brought them home and used them equally to prepare her for a job interview. It's the act of imaging that is what makes this prosecution, right? Well, this is an important point as to her intent, Your Honor. And what, Judge Inglemeyer, what came out of trial is actually that by August of 2015, when the first theft occurred, and that's of the Deutsche Bank living will, Ms. H had already applied to a number of private financial institutions without disclosing, as she was required to do, the conflict of interest. And I think reasonably we could submit by that point had made up her mind that she was leaving the FDIC. And certainly by September 15th, the day before the second set of thefts of the three living wills on the thumb drive, she had decided to resign on September 16th when she actually stole the documents. And so she had to take the documents with her because she knew she would be leaving the FDIC within 24 hours. And so she was planning to have these materials as a private citizen, not as an FDIC or government employee. She was effectively taking them out of the sphere of the secure government environment in which they were being kept. Can I ask a question about going between the cost price for just a minute? With accepting your argument, and there's a plausibility to it, and that if you look up the definition of cost price, the price that is to make a product without a profit being added. But with accepting your argument that we can look to the amount of money that the banks expended in creating these documents require us to go all the way to say that any time the government imposes regulatory requirements on a regulated entity to report, to file reports, that that in essence falls within the statute if the regulated party incurs cost in doing so. And if we don't have to go that far, what distinguishes this case from that one? There's a category of information that's value to the government depends on it being kept secret and short of classified information, although you could cite to the classified information environment, where the value of what the government is getting out of a production. Let's say from, in this case, the banks, depends on the government keeping that information secret. And the testimony trial was it did depend on the government keeping that information secret because leaking the resolution plans or the publicizing of resolution plans would effectively undermine their use in the event of financial crisis. So if the court were to focus on only where the type of information must be kept secret and its value to the government depends on it remaining within this limited sphere of actors of highly important government information, I think that would address exactly the really egregious situation that happened here. Let me push back on that. Imagine a scenario in which the government is holding, let's say, celebrity tax returns, and an IRS employee takes them, doesn't sell them, just takes them. The cost basis to create those well exceeds $1,000, but the government's ability to enforce the tax laws doesn't turn on whether or not they have confidentiality has been breached. You wouldn't seriously be disclaiming the ability to bring a felony prosecution in that case, would you? No, Your Honor. I would leave open the possibility that where the government can establish the $1,000 threshold, which again, in any of these particular cases, is not meant to say we did to $1,000 and that's the most important point that the precise value of a particular document that is stolen is the important point. It's really a test of seriousness. The $1,000 threshold, which is a threshold that applies across a number of statutes, is about the seriousness of what is stolen. There's a case out of the 8th Circuit where a trial exhibit, which consisted of $1,500, which was not subject to forfeiture, and this is the Perez case from the 80s out of the 8th Circuit, was stolen. There was no claim at the end of the day that the government had a $1,500 value to a trial exhibit. Nevertheless, the value to the government, which only had temporary custody of the exhibit because it was a seized bit of currency, was established through the fact that it would be used for an important government function, which in that case would be the prosecution of the case. So if the government, as it did here, can come forward with an explanation about why material or information or a document or a tax return has significant value to it carrying out its function, I think that the jury under Robey is fairly entitled to consider that in making the value judgment. May I just ask you, I know you're out of time, but I want to just ask a couple of questions that are related to the structure of the appeal here. There's a separate ground about serious interference. Is that an element of both the conversion and the embezzlement theories here, or does it limit only the conversion theory? Under the definition of embezzlement, embezzlement can be shown through a taking or through a conversion. The jury was not asked to decide between taking or conversion or to decide both. And so I think fairly the concept of conversion can be read to apply to the knowing conversion under which Ms. Eights was convicted, but also to a degree under the embezzlement theory. And certainly the type of evidence that we put forward with respect to the impact that the theft had on the FDIC, I think would meet under either standard. But you're not arguing that the conviction can be upheld if serious interference wasn't available to be found by the jury. You're not arguing that the embezzlement theory didn't, as litigated here, require such a showing? No, Your Honor, because there was not a distinction on a special verdict form between whether the finding was as to a taking or as to a conversion, I don't believe that we could rely exclusively on the embezzlement aspect of it. Thank you. We'll hear from your adversary, Ms. Cassidy. Good morning, Your Honors. I'd just like to respond to Judge Livingston's question to say that yes, under the governance theory, it would allow any mishandling that is taking home of regulatory documents filed by any regulated party to have a value under 641 based on the lawyer's costs in preparing the filings. That is not what the statute contemplates. The Statute 641 has a very strict, limited monetary definition of value, which includes, relevant here, market value or cost price. Now, the government seeks to just argue value, basically value, as just a nebulous concept, because Roe v. is a market value case, even though it's arguing cost price. Ms. Cassidy, the government elicited evidence that Northern Trust paid $3.3 million and the other banks paid $8.3, $5 million and $11 million, respectively. It's not nebulous. I think their principal argument is that the process of creation of these documents as a matter of cost, labor, professional services, vastly exceeded $1,000. Your Honor, as the court found, that was only the cost to the lawyers, to the banks, their lawyer's fees. That wasn't the cost to the government. Cost price, as all the cases I've cited in my brief show, means the cost to the owner, the cost to acquire the property. And that makes sense, because 641 is really intended to deal with property that the government has bought or could sell. In all of the cases, all of the cases cited by the government are cases involving some kind of goods or something where market value has been shown. There is no case cited by the government that says cost price... How do you respond to the government's argument that when you look at the evidence as a whole, all of the circumstances, including what it costs the banks to create the documents, the steps that the FDIC took to protect the documents, the scheming by the defendant to take the documents, her willingness to brave the security measures, when you look at all of those facts together, couldn't a jury reasonably find that these things were worth more than $1,000? No, not under the definition of value in the statute. Yes, Official Delphin, who was the director of the OFCI, said that they had regulatory value. The only value that he could ascribe to these documents was regulatory value. They were valuable to the mission of the OFCI. Isn't it reasonable to infer that confidential business information of the large banks and issues here had some market value? There may not be a market, but there were individuals, there were other competitors, there were people in the world. It's plausible that they would be willing to expend resources. Your Honor, if the government adduced any evidence of that, there was no evidence of that. The government could have tried to prove that somebody would have paid for these. I'm struggling a little bit with cost price, so let me hopefully explain my issue. If you look, as my colleague suggested, at all the evidence as a whole, one of the things we can look at is cost price. The statute doesn't say that the cost price has to have been incurred by the government. It would have been rather easy to say that. If they wanted to say that, they could have just said, face par market value or cost price to the government. Those words aren't in the statute. There's substantial evidence of a large amount of money being paid to assemble this information. If you look at the definition of cost price in any dictionary, it just means the price to make a product. That's what the banks did here. If you look at that evidence, along with the confidential stuff, and also just the nature of this information, it's hard to imagine that it's not worth $1,000. Your Honor, that's the word, imagine. That's what we have to do here, is imagine that somebody would actually pay for this, having the government put on no evidence that anybody would be interested in paying for this. We have to break it down. It's got to be either cost price or market value. It can't be a squishing of the two categories. The fact is that they did seem to be important to her. She was looking for a job. The timing, does that not suggest that maybe someone would want them to help them get a job? At the most, it might suggest that she might think that they have value. But if they don't, the government could have put on evidence. It could have called an expert if it believed that these had any value. Let me just remind the Court that these wills were old, outdated, superseded wills from a few years before. There was no evidence that anybody would want to buy them. In fact, one of the bank witnesses testified that no bank would want them. That no bank would ever want them. And that no bank who was hiring somebody, applying for a job, would think that even their knowledge of a specific living will, even in a resolution plan job, would help them get the job. What was important was general knowledge of how these things work, not the specifics of any living will. So, no, the evidence was that competitors would not be interested. If the government thought that somebody else might be interested, there might be some value out there that it could be sold, it was free to put on that evidence. But it put on no evidence. And as to the cost-price theory... That's simply an artifact of the fact that there's not a thieves' market for this unusual type of document. But that just means that that mode of valuation isn't realistically available. The issue is, given the cost is flat out there in the text of the statute, why isn't that enough? Because the case is all... There's no case ever holding that cost-price is the cost that some private party spent to file documents with the government. Cost-price in the case law, in the cases I've cited in my brief, is the cost that the owner spent... And that was what Congress understood. These are cases that were older cases established at the time this statute was passed. That cost-price is the price the owner pays to acquire the goods. And the owner here of these documents was the government. But that's the typical fact pattern. But why isn't that a rational limitation that Congress would want to draw? Why would Congress care whether a third party or the government was the one that laid out the money to create? Why? Because Congress never intended that the property with a value of greater than $1,000 would be talking about this kind of regulatory situation. In fact, Congress has passed other statutes. There are other statutes on the books, Section 180C, 1905, 1906, 1907, I believe, they're all in a row, that punish the disclosure of confidential government information, and it's a misdemeanor. A record of this kind, a government record of this kind, is a misdemeanor. It was always meant to be a misdemeanor. It was meant to be a misdemeanor in this statute as well. Theft of property... So should the district court then, if finding not $1,000, that $1,000 hadn't been met, converted the conviction to a misdemeanor? No, because that was not charged as a lesser-included offense. And there's a case, I have it, it's DINSA, a case in this circuit, 243F3-635, and it was reaffirmed in Taylor, 816F3-12, that only if a lesser-included offense is charged to the jury may the court reduce it. If it's not charged, it cannot. May I ask you, the district court's decision uses the expression against the weight of the evidence, but you didn't move under Rule 33, you just moved under Rule 29. Is it necessarily right to even construe what the district court did here as applying the Rule 29 standard? Yes, it did, because it granted a judgment of acquittal. It did not set aside the verdict for a new trial. That was just a misstatement on the court's part. The court found the evidence was insufficient on both prongs, the value prong and the serious interference prong. Now, I would like to speak a bit about serious interference. The government basically relies on the Blasek decision for a serious interference argument, and that case turned on the disclosure. There were three factors that the court found established serious interference. Only one was the strong interest in confidentiality. The other two were based on the disclosure of the information. In this case, as the court found, as the record shows, there was no evidence of any disclosure to any third party, nor any intent to disclose it, nor any intent to use it in any way. The government's theory that Ms. Eights intended or probably intended to use this to get a job at Deutsche Bank was just a theory, and it was based solely on one phone call. She probably got thousands of phone calls. She put in 20 applications to each bank. She was applying to every bank. What about the timing, the sequence of events? Isn't that some evidence that she intended to use them? Well, Your Honor, what's missing from that timing is that on the very day, not the next day, but on the very day she downloaded, and it was only a portion of the Deutsche Bank, it was only a summary, the executive summary portion of the Deutsche Bank document. Just before that, and that's in the record, I believe it said in the 150s, but she had just downloaded the Wells Fargo Resolution Plan that she was assigned to. The testimony in the record is that she was assigned to the Wells Fargo Global International Cooperation Section, that it required her to understand foreign banks' issues, issues facing banks in other jurisdictions. She had to do a report on that and an analysis, and right after she downloaded that, which she was assigned to, she then downloaded a portion, just the summary, of the Deutsche Bank document, which she was allowed to access. That's another issue, that the government suggested she was not allowed to access other plans, and she was. That's a testimony to her supervisor Luke's testimony. She acknowledged that Government Appendix 99 to 100, that the security rules allowed someone with access to access all plans and review materials on the system. The most she said was that she didn't need to access Deutsche Bank because she wasn't assigned to it, but she never testified that she was not supposed to or she couldn't. The government could have asked that question, and it chose not to because that was not the rule. It was clear from all the testimony that employees who were assigned to living wills could access all the wills. She testified that she used this in her work on Wells Fargo. That is closer to the time than this call from Deutsche Bank. As I said, she applied to many banks and submitted hundreds of applications. She was probably on the phone with recruiters every day, but this one was plucked out as, Aha, this must be it. It's not enough. As this court held in Pauling, speculation is not inference. Thank you, Ms. Cassidy. We'll hear rebuttal. Thank you, Your Honor. Let me begin by a clear factual misstatement and inaccuracy from my friend's response, which is that these documents were old and outdated. Count One's document, the Deutsche Bank document, was the 2015 living will, and a second document, which Deutsche Bank's own representative testified, was a summary of all of the important aspects of its living will. That was the most up-to-date version of that document. It was filed just two months before Ms. H. resigned, so this was not outdated documents. Even the documents that she took from 2013 were the versions that had been filed just two years prior, and they were the first versions of living wills filed by any of the financial institutions. Second, this idea that the government needs to have paid for something in order for it to have value is directly contrary to case law from this circuit and every other circuit. Girard, where they've stolen information from the 1970s, the seminal case in intangible property thefts, the theft of DEA confidential informant names, that is not something the government paid for. The Fourth Circuit cases where the theft was of bidding information that is submitted to the government for defense contracts, both McCausland and Matzkin, that is not something the government pays for. There's absolutely no requirement in establishing value, which can be done both through cost price or market value or a combination of them. The jury is entitled to consider, as Judge Fremley said more than 50 years ago, this is something we can clearly entrust to a jury to decide if something is of such significance that a felony conviction is warranted here. This was a case where these documents were either worth millions and millions of dollars or absolutely nothing. And what the jury decided was that these documents, consistent with the evidence both from the bank witnesses, from Director Delfin, from the security procedures, and from the extreme and significant efforts that Ms. Yates took to secret these documents and take them home with her, that these had to have been valuable for her to have gone through such extremes to have stolen these materials. And it's that evidence that the jury relied upon and that the district court did not address in its decision, and for those reasons the district court's decision should be reversed. One question on substantial interference. I take it that all she did was ultimately to possess a copy, but there wasn't evidence of actual affirmative use. Understanding the potential for serious interference, how is substantial interference in fact proven here? So the substantial interference was proven here through the testimony of Director Delfin who specifically testified that the loss of the information from the secure environment in which it is kept compromises a type of communication called confidential supervisory information communications that depend on secrecy and the trust that banks are required to have that regulators will keep their information secret is what provides the banks the incentive to be truthful and provide the regulators the information that ultimately they could use if or hopefully would never need it, but for a terrible reason that the bank had to be resolved or had to go into bankruptcy. And so it was the risk to the chilling effect that would happen if this information left the secure environment as it did. That was one of the main points that the government established. Additionally... Well, if it left the secure environment and then the breach of the secure environment became known to the relevant bank, if in fact the prosecution didn't happen or the copying went undiscovered, there would have been no serious interference unless Ms. Ates went ahead and did something that the record reflected she hadn't yet done. Well, that poses the even more serious question of does the government need to wait until someone trades on information or as Ms. Cassidy suggested, sells information in order to act when intent is absolutely clear, when the nature of the information is so highly confidential that waiting could pose an extreme risk to a financial industry or to the U.S. economy as a whole. As Morissetti said, conversion is misuse and abuse of property. When the evidence of misuse and abuse and lack of authorization and intent as it was here is so absolutely clear, those are the factors that the restatement among other things addresses when you look at conversion. I don't think that relying on simply one factor for serious interference at the end of the day should be a trump card over all of the additional factors. I will say, however, that in that situation where the theft was not discovered, the risk is no less significant to the government because now you have a rogue actor with confidential bank information who is able to trade on the securities markets, who is able to take that information to competitor firms and ultimately, in the event of a financial crisis, is able to front run the resolution strategy. What that means is once the FDIC tries to implement the strategies that it spends the entire purpose of this office creating, it will not have effective strategies because there will be a rogue actor in the market who can purchase asset classes from the banks, who knows the primary risk to the bank in its resolution strategy. What the FDIC would need to do in that circumstance is come up with a new resolution strategy that depends on the fact that some rogue actor in the market has information about how the bank would normally have been resolved in the event of a financial crisis and that would require additional expense and additional risk both to the FDIC and being able to carry out its mission as well as to the financial institutions. Director Delfin in his testimony was very detailed on this, testified about a number of the substantial risk that the FDIC and the U.S. economy will broadly face from the loss of this information from the secure environment. Thank you, Mr. McDonald. We will take the matter under advisement. Thank you both. Well argued in an unusual context.